**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————

ASHLEY TERRILL, an individual,          CASE NO.

          Plaintiff,          COMPLAINT

    v.

GAWKER MEDIA, LLC, a Delaware limited
liability company; SAM BIDDLE, an
individual, JOHN COOK, an individual, and
DOES 1-20,


        Defendants.
——————————————————————


      Ashley Terrill, by and through her undersigned attorneys, sues defendants Gawker Media,

LLC, Sam Biddle, John Cook, and DOES 1-20 (collectively, "Defendants"), and respectfully

makes the following allegations.

## SUMMARY OF THE CASE

      Ashley Terrill is a journalist, researcher and writer.  In 2015, she notified Defendants

about a major story matter that she was researching and writing about, and obtained Defendants'

agreement to (1) maintain in strict confidence the information that she would disclose to

Defendants, and (2) provide assistance to her regarding the matter.  Unbeknownst to Terrill,

Defendants concealed that they were working with the very subjects of Terrill's investigation and

story and had no intention of keeping their promises to her.  Defendants then published a false

and highly defamatory hit-piece about Terrill, and in the process disclosed publicly the

confidential information that Terrill had disclosed pursuant to Defendants' agreement to maintain

1

it in strict confidence. Terrill promptly demanded a retraction and removal of the false and

defamatory statements about her, and the confidential information that she had disclosed to

Defendants.  Defendants refused Terrill's demands.  Defendants' wrongful acts have caused

substantial damages to Terrill, including to her personal and professional reputation.  Defendants'

refusal to do anything to remedy their wrongful acts have left Terrill with no alternative but to

bring this lawsuit.  Terrill seeks an award of no less than $10 million in damages.

## PARTIES

1.      Plaintiff is a resident of the City of West Palm Beach, County of Palm Beach,

State of Florida.

2.      Upon information and belief, Gawker Media, LLC ("Gawker") is a Delaware

limited liability company with its principal place of business located in New York City, New

York.

3.      Upon information and belief, defendant Sam Biddle ("Biddle") is an individual,

domiciled in the State of New York.  At all relevant times, Biddle was, and is, a Senior Writer at

Gawker.

4.      Upon information and belief, defendant John Cook ("Cook") is an individual,

domiciled in the State of New York.  At all relevant times, Cook was, and is, Executive Editor at

Gawker.

5.      Upon information and belief, Defendants, and each of them, were and are the

agents, licensees, employees, partners, joint-venturers, co-conspirators, owners, principals, and

employers of the remaining Defendants and each of them are, and at all times mentioned herein

were, acting within the course and scope of that agency, license, partnership, employment,

conspiracy, ownership, or joint venture.  Upon further information and belief, the acts and conduct herein alleged of each of the Defendants were known to, authorized by, and/or ratified by the other Defendants, and each of them.

## JURISDICTION & VENUE

6.       This Court has personal jurisdiction over Defendants because they have minimum contacts with the State of New York, and are domiciliaries of the State of New York.

7.        The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of the parties to this action and the amount in controversy exceeds $75,000.

8.       Venue is proper in this district pursuant to 28 U.S.C. Section 1391(b), in that each of the defendants reside here and a substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS RELEVANT TO ALL CAUSES OF ACTIONS

9.       In or about October of 2013, Terrill pitched two stories to ELLE magazine about the co-founders of the billion-dollar technology company and dating app "Tinder."  In connection with her research for those stories, Terrill interviewed with Tinder's CEO, Sean Rad ("Rad") and Vice President of Marketing, Whitney Wolfe ("Wolfe"), among others.

10.       On or about October 21, 2013, Terrill's interview with Wolfe was posted on Elle.com.

11.       In or about April of 2014, Wolfe resigned from Tinder.

12.       Two months later, on June 30, 2014, Wolfe filed a lawsuit against Tinder, Tinder's parent company Match.com and their parent company, IAC, Inc.  The lawsuit was premised on

allegations of sexual harassment and sexual discrimination against Wolfe by Rad, and Tinder's Chief Marketing Officer, Justin Mateen ("Mateen").  The lawsuit made national news, and thousands of articles were written about it.

13.     That same day, Terrill received a phone message from an attorney representing Wolfe.  The attorney informed Terrill of Wolfe's lawsuit against Tinder and offered to send information about, or speak to her, about the case.

14.     Terrill read Wolfe's complaint, and certain statements in it seemed inconsistent with Terrill's recollection of the events as described to her by those with first hand knowledge. Terrill then went back to her research, including her recorded interview of Wolfe and others. Terrill found that there were potentially inconsistences between Wolfe's allegations in the lawsuit and Terrill's past research, specifically Wolfe's previous statements to Terrill.

15.     In light of the inconsistencies, Terrill shifted the focus of her research, and started researching the founding of Tinder.  Terrill reviewed numerous materials, reached out to more than thirty individuals and conducted on-the-record interviews with at least fourteen sources close to the subjects of this new story.  Terrill sought to fully and fairly research matters which she believed had been only superficially covered by numerous news outlets who had not investigated the underlying facts.

16.     Throughout the course of her research, Terrill sought only to ascertain the truth regarding Tinder's history as well as the allegations in Wolfe's lawsuit.

17.     After leaving Tinder, Wolfe joined two other ex-Tinder employees, Sarah Mick ("Mick") and Christopher Gulczynski ("Gulczynski") to launch a competitor company called "Bumble."  The event was major business news, and covered in thousands of news articles.

4

18.     On or about August 18, 2015, Terrill received a voicemail message from Bumble's Vice President of Communications, Jennifer Stith ("Stith"), who stated that she wished to "confirm" with Terrill that she was working on a piece about Whitney Wolfe "before taking any next steps."

19.     Hours later, Terrill received a voicemail message from the attorney representing Wolfe in her lawsuit.  Wolfe's attorney demanded that Terrill make contact with him before she wrote anything "that could potentially subject [Terrill] or others to legal liability."  The obvious implication of the statement was that if Terrill proceeded to research and/or write about the underlying facts regarding Wolfe, including the potential inconsistencies between Wolfe's past statements and other events from the past, and Wolfe's allegations in her lawsuit against her fellow co-founders at Tinder, then Terrill could expect a lawsuit to follow.

20.     Almost immediately following these two phone calls, Terrill's personal computer and smart phone started acting erratically and showing signs of potentially having been hacked. Terrill also observed unusual activity in her personal surroundings.

21.     Terrill reached out to a friend of hers for help with this situation and the friend referred her to a producer at Gawker.  Hoping the producer might have some insight or advice, Terrill explained the two phone calls to the producer and described the unusual activity with both her personal computer and smart phone.  Terrill expressed concern about potentially being hacked and intimidated.  The producer at Gawker told Terrill that Gawker Executive Editor John Cook and his team had the resources to research the unsettling activity that Terrill was experiencing.

22.     Gawker Senior Writer Sam Biddle then contacted Terrill and told Terrill that she

could trust him.  Terrill expressed to Biddle that she was looking for help with her situation and unsure of what to do.  She asked Biddle to maintain the confidentiality of the information that she was to share with him, and provide her with whatever advice or assistance that he could. Biddle agreed; assured Terrill that her communications to Gawker would be treated confidentially; agreed that Gawker would not misappropriate her story; asked her to furnish supporting materials; and informed Terrill that he intended to provide her with advice and assistance in her situation.

23.     Apparently, all such statements, representations and agreements by Defendants to Terrill were knowingly false at the time they were made.  Terrill was not aware of the falsity of the statements, representations and agreements, and reasonably relied upon the truth of those statements, representations and agreements to her detriment.  Defendants in fact had no interest, desire or intent to assist Terrill.  Nor did Defendants have any interest in seeking the truth underlying the story of the co-founders of Tinder or any discrepancies in Wolfe's allegations in her complaint against her fellow co-founders.

24.     Rather, Defendants had only one interest:  to write their own scathing article about Terrill in a way that was knowingly false, libelous of Terrill, and would foreseeably harm, if not destroy, her personal and professional reputation.

25.     The motivation for Biddle's betrayal, in addition to economic gain, appeared to be Biddle's ongoing personal relationship with Wolfe and Gulczynski, which he actively concealed from Terrill.  In fact, on information and belief, Biddle was regularly communicating with Wolfe and Gulczynski throughout the time that Terrill was confiding in Biddle.  Biddle concealed his relationship with Wolfe and Gulczynski from Terrill because Biddle knew that he could not

successfully induce Terrill to disclose her confidential research if she knew about the relationship with Wolfe and Gulczynski.

26.     On or about November 23, 2015, Defendants' published on Gawker's flagship website Gawker.com, a lengthy story with the headline "Tinder Confidential: The Hookup App's Founders Can't Swipe Away the Past" (the "Gawker Story"), a true and correct copy of which is attached hereto as Exhibit A.  The Story is replete with numerous false statements of fact, of and concerning Terrill, which Defendants knew to be false at the time the Story was written and published.

27.     The false statements in the Gawker Story include, among others:

    a.   "Ashley Terrill was in hiding the first time I heard her voice, splitting time between her Los Angeles home and a $600-a-night room at the Beverly Wilshire Hotel. Terrill had locked her laptop and phone in a secret vault, and would only contact me on disposable phones—all because, she claimed, the estranged co-founder of Tinder was trying to destroy her."

    b.   "At the center is Ashley Terrill, a Hollywood columnist on an obsessive, possibly unhinged pursuit of what she says is the truth about Whitney Wolfe. Depending on who's doing the guessing, Terrill is the target of a secret harassment operation, the agent of a covert mudslinging campaign, or an outside observer caught up in a paranoid freakout."

    c.   "It's this audio recording that Terrill says is proof that Whitney Wolfe is not who she says she is—neither a victim nor a co-founder, but a fraud who parlayed a sex lawsuit into a career boost and fame."

d.   "Terrill's claims range from dubious to absurd, but her exhaustive investigation into Wolfe's background has pumped the submerged bile between the two camps up to the surface."

e.   "Terrill's research is an anomaly in the saga of Wolfe vs Tinder, a rare attempt to discredit rather than lionize the plaintiff."

f.   "…Ashley Terrill was compiling evidence against her for some sort of intricate character assassination."

g.   "…[Wolfe[ should expect a 'takedown story' coming soon from Terrill."

h.   "…[I]t immediately looked like a covert attempt to smear her (and her company) without breaking their mutual non-defamation agreement."

i.   "…Terrill's takedown [story] could appear as a magazine story, a book, or possibly even a film, all aimed at portraying [Wolfe] as the villain in the Tinder breakup."

j.   "Terrill … claimed she'd found vast inconsistencies that not only undermined the legal case, but Wolfe's entire character. It was deeply personal."

k.   "Terrill's conclusion was that Wolfe is [a businesswoman who ruthlessly exploited every opportunity for her gain (even if unethically)]."

l.   "Terrill was in a state of absolute terror and perpetual anxiety—it hung on her voice as she mentioned ... the friends she could no longer contact, and the people she could no longer trust."

m.   "[T]he only evidence she furnished of a phone hack was a generic security warning message."

8

n. "The most interesting part was a denial that she'd been put up to her project by her friend at Tinder, nor been compensated for it"

o. "…[S]he's still making a very charged claim about someone from whom she has little objective distance. Why call Wolfe a liar, a year later?"

28.     The forgoing false statements of fact were made by defendants with the intention and knowledge that they were false and were likely to harm Terrill's personal and professional reputation.  The false and libelous statements in the Gawker Story had the foreseeable effect of severely harming Terrill's personal and professional reputation.

29.     Gawker is a company that routinely engages in wrongful conduct, and specifically, writes and publishes false and defamatory statements about people, invades people's privacy and other rights, and publishes content that is irresponsible and that no other legitimate publication will publish.

30.      By way of example, Gawker is currently defending a lawsuit by Hulk Hogan for publishing an illegal, secret recording showing him naked and having consensual sexual relations in a private bedroom.

31.     Gawker has been sued, and is currently defending the action in New York State Court, by the *Daily Mail* newspaper for defamation arising from its publication of numerous false statements.

32.     Gawker has been sued, and is currently defending the action in federal court, by an individual named Charles Johnson, for writing and publishing false and unsubstantiated rumors that Mr. Johnson had been involved in misconduct and criminal activity.

33.     Gawker has been sued, and is currently defending the action in a federal district court, filed on behalf of more than 300 interns of Gawker who were never paid for their work, or were paid compensation below the minimum wage.

34.     Gawker has been sued, and paid a substantial settlement, for publishing a stolen private video of actors Rebecca Gayheart, her husband Eric Dane, and a friend of theirs, partially nude in a hot tub.

35.     Gawker has been sued by Dr. Phil's production company for copyright infringement after Gawker planned to "steal," and did air, portions of an interview before it aired on Dr. Phil's television show.

36.     Gawker published videotape of a clearly intoxicated young woman engaged in sexual activity on the floor of an Indiana sports bar (the footage was taken by another patron with his cell phone).  According to published reports, Gawker callously refused to remove the footage from its site for some time, despite repeated pleas from the woman to do so and despite the fact that it was not clear that the sex was consensual or whether the video was footage of a rape in progress.

37.     Gawker paid a source for a photograph of what the source claimed was NFL quarterback Brett Favre's penis.  Gawker published the photo, uncensored, stating that it was a photograph of Mr. Favre's penis.

38.     Gawker published photos of Dutchess Kate Middleton's bare breasts, captured by a paparazzi's telephone lens while she was sunbathing at a secluded, private estate in France.

39.     Gawker published complete, uncensored, and unedited videos of seven innocent individuals being beheaded by ISIS soldiers.  The videos were distributed by ISIS for the

purpose of terrorizing the Western world.  On information and belief, Gawker was the only

established media company to publish these videos in full and uncensored, showing the victims

being beheaded. Gawker was criticized severely by the press and terrorism experts for furthering

the terror campaign of ISIS, and showing a total lack of regard for the families of these victims.

40.     Gawker hacked a promotional campaign sponsored by Coca-Cola, in which the

company utilized the hashtag "#MakeItHappy." The campaign was originally designed to allow

people to type statements into a decoder, and the decoder converted the statements into positive,

happy statements.  Gawker's hack caused the campaign to publish highly offensive statements

from Adolf Hitler's *Mein Kapf*.  Gawker was resoundingly criticized throughout the media for its

actions.

41.     Gawker attempted to publicly "out" a private individual, a media executive at a

rival publishing company, by publishing a story alleging that the media executive had attempted

to solicit a male porn star and prostitute.

42.     Gawker's actions in publishing these allegations regarding the media executive,

including identifying the executive and the company for whom he worked by name, publishing

the accusations of the gay porn star, and protecting the identity of the porn star "source," were

severely criticized throughout the media industry.  As a result, Gawker removed the story within

about a day.  A few days later, two senior executives at Gawker promptly resigned their

positions, and many other Gawker employees followed suit.  It was reported that multiple major

advertisers pulled their advertising from Gawker, and Gawker's revenues sank as a result.

Following these events, several more senior executives, and other employees, resigned or were

terminated.

43.     During the seven-month period of April to November 2015, six of the eight most senior executives at Gawker and Gawker.com resigned:  President of Advertising Andrew Gorenstein, COO Scott Kidder, Chief Strategy Officer Erin Petigrew, Chief Technology Officer Tom Plunkett, Editorial Chief Tommy Craggs, and Editor-in-Chief Max Reid.  Of the original Executive Board from April 2015, only CEO/founder Nick Denton and head lawyer Heather Dietrick remain at the company.  (Gawker had no CFO during this time.)

44.     A former Gawker staff writer, Dayna Evans, published a November 2015 article entitled, "On Gawker's Problem With Women," ("the Evans Article") in which the writer exposed gender inequalities within the company as well as an endemic of reporting failures and failures of journalistic ethics.  The Evans Article states that the company's reporting tactics "can lead to dismissiveness and insensitivity, harm and marginalization, often unforgettable and unforgivable damage."  The Evans Article further states that writers and editors at the company "are in fact REWARDED and admired for their recklessness and immaturity, a recklessness and immaturity, that, as you know, has gotten the company in heaps of trouble over the past couple of years."  The Evans Article goes on to state that the above assertions are true, "especially so at a place like Gawker, where bylines are associated with traffic and traffic is associated with success."

45.     Defendants have no interest in reporting the truth to the public, or investigating the facts underlying a story, or for that matter even telling the truth to its readers.  Rather, Defendants make up lies about the subjects of their stories—Terrill being one—without any regard to the substantial consequences that their false statements will have on the subjects of their stories: destroying their personal and professional reputations.

46.     Defendants also have no regard for maintaining the confidentiality of their sources (here, Terrill), or honoring their assurances, representations, and agreements to their sources to maintain confidentiality and not write stories (particularly false and completely fictionalized stories) about their subjects.  Rather, Gawker's only interest is to publish false scandal, for the purpose of profit, knowing that the false stories will severely harm if not destroy the careers of innocent people who are the subject of their stories.

47.     This is precisely the situation in this case:  Defendants' actions have the effect of so severely discrediting Terrill—based on Defendants' knowingly false statements about her— that Terrill's career has been severely harmed, if not destroyed.  As a direct result of Defendants' publication of the false and defamatory statements about Terrill, on information and belief, Conde Nast Entertainment decided not to publish or produce Terrill's work and Buzzfeed declined to hire her as a writer at its website.  Terrill further is informed and believes that Defendants interfered with other opportunities of hers, including with *New York Magazine* and Buzzfeed.

48.     According to Gawker.com, more than 157,000 people have read the story that Defendants wrote and published, and presumably those readers have spoken to others about the story.  Moreover, anyone who might search Terrill through a search engine will see Gawker's false and libelous story about her.  As a result, anyone who might otherwise have been inclined to hire or partner with Terrill likely will decline, and have declined, to do so, believing Defendants' false and libelous statements about her to be true.

49.     Defendants actively and knowingly participated in the conduct described herein.

50.     Defendants are guilty of intentional misconduct.  Defendants had actual

knowledge of the wrongfulness of the conduct described herein and the high probability that

injury or damage to Plaintiff would result and, despite that knowledge, intentionally pursued that

course of conduct, resulting in injury or damage.

51.     Defendants' conduct was so reckless or wanting in care that it constituted a

conscious disregard or indifference to the rights of persons exposed to such conduct.

52.     Defendants' actions described herein also have had the foreseeable effect of

causing severe emotional distress to Terrill.

53.     On December 24, 2015, Terrill's counsel sent a letter to Defendants requesting

that they remove each of the false statements in the November 23, 2015 story and publish a

correction, apology and retraction of those statements.  Defendants failed to comply with Terrill's

request, in whole or in part.

54.     As a result, Terrill had no other alternative but to file this lawsuit.

55.     Terrill requests herein all available legal and equitable remedies, to the maximum

extent permissible by law, including without limitation compensatory damages and punitive

damages in an amount not less than Ten Million Dollars ($10,000,000).

## FIRST CAUSE OF ACTION
### (Libel)

56.     Plaintiff hereby repeats and realleges each and every allegation set forth in

paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.     As described herein, on or about November 23, 2015, Defendants authored and

published false statements about Plaintiff in a lengthy story on the website Gawker.com entitled

"Tinder Confidential: The Hookup App's Founders Can't Swipe Away the Past."  These false

statements include:

14

a.   "Ashley Terrill was in hiding the first time I heard her voice, splitting time between her Los Angeles home and a $600-a-night room at the Beverly Wilshire Hotel. Terrill had locked her laptop and phone in a secret vault, and would only contact me on disposable phones—all because, she claimed, the estranged co-founder of Tinder was trying to destroy her."

b.   "At the center is Ashley Terrill, a Hollywood columnist on an obsessive, possibly unhinged pursuit of what she says is the truth about Whitney Wolfe. Depending on who's doing the guessing, Terrill is the target of a secret harassment operation, the agent of a covert mudslinging campaign, or an outside observer caught up in a paranoid freakout."

c.   "It's this audio recording that Terrill says is proof that Whitney Wolfe is not who she says she is—neither a victim nor a co-founder, but a fraud who parlayed a sex lawsuit into a career boost and fame."

d.   "Terrill's claims range from dubious to absurd, but her exhaustive investigation into Wolfe's background has pumped the submerged bile between the two camps up to the surface."

e.   "Terrill's research is an anomaly in the saga of Wolfe vs Tinder, a rare attempt to discredit rather than lionize the plaintiff."

f.   "…Ashley Terrill was compiling evidence against her for some sort of intricate character assassination."

g.   "…[Wolfe[ should expect a 'takedown story' coming soon from Terrill."

h.   "…[I]t immediately looked like a covert attempt to smear her (and her company) without breaking their mutual non-defamation agreement."

i.   "…Terrill's takedown [story] could appear as a magazine story, a book, or possibly even a film, all aimed at portraying [Wolfe] as the villain in the Tinder breakup."

j.   "Terrill … claimed she'd found vast inconsistencies that not only undermined the legal case, but Wolfe's entire character. It was deeply personal."

k.   "Terrill's conclusion was that Wolfe is [a businesswoman who ruthlessly exploited every opportunity for her gain (even if unethically)]."

l.   "Terrill was in a state of absolute terror and perpetual anxiety—it hung on her voice as she mentioned ... the friends she could no longer contact, and the people she could no longer trust."

m.   "[T]he only evidence she furnished of a phone hack was a generic security warning message."

n.   "The most interesting part was a denial that she'd been put up to her project by her friend at Tinder, nor been compensated for it"

o.   "…[S]he's still making a very charged claim about someone from whom she has little objective distance. Why call Wolfe a liar, a year later?"

58.   These false statements wrongly accuse Plaintiff of having made statements and acted in a manner that would subject her to hatred, distrust, contempt, aversion, ridicule and disgrace in the minds of a substantial number in the community, and were calculated to harm her social and business relationships, and did harm her social and business relationships.

16

59.     The statements made by Defendants were false and no applicable privilege or authorization protecting the statements can attach to them.

60.     Defendants made the above false statements after Biddle: (a) fraudulently represented to Plaintiff that her communications to Gawker would be treated confidentially and that Gawker would not misappropriate her story, and (b) concealed the fact that he was in regular contact with Wolfe and Gulczynski during the time that he was inducing, and did induce, Plaintiff to disclose confidential and highly sensitive information to him.

61.     Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the statements made by Defendants in an amount to be determined at trial.  The false statements attribute conduct, characteristics and conditions incompatible with the proper exercise of Plaintiff's business and duties as a journalist.  Because the statements were widely disseminated on the Internet, they were also likely and intended to hold the Plaintiff up to ridicule and to damage her social and business relationships.

62.     The above-quoted published statements constitute egregious conduct constituting moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages relating to defendants' making of the above-quoted defamatory statements, in an amount to be determined at trial.

63.     Plaintiff has complied with all notice requirements prior to filing this action by informing Defendants of their defamatory statements, and requesting a retraction, in a letter dated December 24, 2015.

/ / /

/ / /

17

## SECOND CAUSE OF ACTION
**(Breach of Confidence)**

64.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 63 of this Complaint as if fully set forth herein.

65.     Plaintiff requested, and Biddle agreed, that Plaintiff's communications to Defendants would be treated confidentially; that Defendants would not misappropriate her story; and that Defendants would provide advice and assistance in her situation.

66.     As a result of the agreement between the parties to maintain the confidentiality of Plaintiff's communications and story, Plaintiff disclosed, and Defendants encouraged Plaintiff to disclose, confidential and proprietary information, including much of the confidential and highly sensitive information Plaintiff obtained through interviews and research.

67.     Plaintiff reposed trust and confidence in Defendants and Defendants encouraged and accepted such trust.

68.     Defendants have improperly breached their promise of confidentiality to Plaintiff and have improperly used the confidential information they obtained as a result of such confidential relationship by:

     (a)  Repudiating any obligation of confidence to Plaintiff;

     (b)  Widely disseminating Plaintiff's confidential research in the Gawker Story published at Gawker.com;

     (c)  Using and disclosing to others, in competition with Plaintiff, Plaintiff's confidential information or exploiting such confidential information for Defendants' profit.

69.     Defendants have acted knowingly, willfully, and unlawfully, and with the intent to use and profit from Plaintiff's confidences.

70.     Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

71.     Plaintiff has suffered and will continue to suffer irreparable injury by reason of the aforementioned conduct.

72.     Plaintiff has additionally suffered and will continue to suffer monetary loss as a result of the breach of confidence in which Defendants have engaged.

73.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Advantage)

74.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75.     Defendants knew that Plaintiff, being a journalist, had business relationships with publishers as well as a reasonable expectation of entering into valid business relationships with additional publishers, including Conde Nast Entertainment, Buzzfeed and *New York Magazine*, which would have been completed had it not been for Defendants' unlawful acts.

76.     Defendants acted solely out of malice, and/or used dishonest, unfair, or improper means to interfere with Plaintiff's actual and prospective business relationships, when Defendants defamed Terrill, disclosed confidential sources and information to the public despite

promises to maintain confidentiality, and misappropriated Terrill's story.

77.     Defendants, through the misconduct alleged herein, intended to harm Plaintiff by intentionally and unjustifiably interfering with her actual and prospective business relationships.

78.     Defendants have seriously damaged Plaintiff's actual and prospective business relationships as a direct and proximate cause of these acts.

79.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

80.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.     Defendants intentionally and fraudulently misrepresented to Plaintiff that her communications to Gawker would be treated confidentially and that Gawker would not misappropriate her story.

82.     Defendant Sam Biddle also concealed his ongoing close, personal relationship with Wolfe and Gulczynski, who are among the subjects of Plaintiff's story, from Plaintiff. Biddle was regularly communicating with Wolfe and Gulczynski throughout the time that Plaintiff was confiding in Biddle and providing him with confidential information at his request and inducement, and under an obligation to Terrill to maintain such information in confidence.

83.     Defendants knew that the representations described herein were false at the time they were made.  Defendants, while knowing that Plaintiff had reposed her trust and confidence

in them, were under a duty to disclose the truth to Plaintiff.

84. Plaintiff relied on Defendants' misrepresentations to her detriment. Defendants' misrepresentations and omissions were intended to induce, and did induce, Plaintiff to disclose her confidential and proprietary research.

85. Plaintiff has been seriously damaged as a direct and proximate result of these misrepresentations by Defendants.

86. The above-described conduct is egregious and constitutes moral turpitude. As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ashley Terrill respectfully requests:

(a) An award of damages to Plaintiff in an amount to be determined at trial, but in all events not less than Ten Million Dollars ($10,000,000);

(b) An award of punitive damages to Plaintiff in an amount to be determined at trial;

(c) An order requiring Defendants to make a public retraction of the false statements;

(d) An order granting preliminary and permanent injunctive relief to prevent defendants from making further defamatory statements about Plaintiff; and

/ / /

21

(e)  An award of such other and further relief as the Court may deem just and

proper.


Dated: January 19, 2016                          Respectfully submitted,


                                                 **HARDER MIRELL & ABRAMS LLP**


                                                 By: */s/ Charles J. Harder_____*

                                                 Charles J. Harder, Esq.
                                                 132 S. Rodeo Drive, Suite 301
                                                 Beverly Hills, California 90212
                                                 Tel. (424) 203-1600

                                                 Andrea Moss, Esq.
                                                 100 Church Street, 8th Floor
                                                 New York, New York 10007
                                                 Tel. (212) 242-6152

                                                 *Counsel for Plaintiff*