**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

ASHLEY TERRILL, an individual,         CASE NO. 1:16-cv-00411 (NRB)

        Plaintiff,            **FIRST AMENDED COMPLAINT**

     v.

GAWKER MEDIA, LLC, a Delaware limited
liability company; SAM BIDDLE, an
individual, JOHN COOK, an individual,
NICHOLAS GUIDO DENTON, an individual,
and DOES 1-20,

        Defendants.
_____

     Plaintiff Ashley Terrill, by and through her undersigned attorneys, sues defendants

Gawker Media, LLC, Sam Biddle, John Cook, Nicholas Guido Denton, and DOES 1-20

(collectively, "Defendants"), and respectfully makes the following allegations.

<u>**SUMMARY OF THE CASE**</u>

     Ashley Terrill is a journalist, researcher and writer.  In 2015, she notified Defendants

about a major story matter that she was researching and writing about, and obtained Defendants'

agreement to (1) maintain in strict confidence the information and materials that she would

disclose to Defendants, and (2) provide assistance to her regarding the matter.  Unbeknownst to

Terrill, Defendants concealed that they were working with the very subjects of Terrill's

investigation and story and had no intention of keeping their promises to her.  Defendants then

published a false and highly defamatory hit-piece about Terrill, and in the process disclosed

1

publicly confidential information and materials that Terrill had disclosed pursuant to Defendants' agreement to maintain them in strict confidence. Terrill promptly demanded a retraction and removal of the false and defamatory statements about her, and the confidential information that she had disclosed to Defendants.  Defendants refused Terrill's demands.  Defendants' wrongful acts have caused substantial damages to Terrill, including to her personal and professional reputation.  Defendants' refusal to do anything to remedy their wrongful acts has left Terrill with no alternative but to bring this lawsuit.  Terrill seeks an award of no less than $10 million in damages.

After filing this lawsuit, Terrill learned that in late 2015, Biddle blogged about his own drug abuse and having mental health issues as a result, and that these problems intensified in the latter part of 2015—when Biddle was engaged in the wrongful acts alleged herein.  Plaintiff is informed and believes that Biddle's drug abuse and problems relating thereto were well known to both Nick Denton, the CEO of defendant Gawker Media, LLC, and to John Cook (Biddle's editor), but that Denton and Cook nevertheless retained Biddle as an employee, and were well-aware that Biddle's drug abuse was causing him to engage in wrongful conduct with respect to his reckless reporting, and the resulting harm that such reporting was causing to the subjects of his articles, including to Terrill as alleged herein.  Terrill therefore brings a claim against both Denton and Cook for their negligent retention of Biddle.

## PARTIES

1.     Plaintiff is a resident of the City of Jupiter, County of Palm Beach, State of Florida.

2.     Upon information and belief, Gawker Media, LLC ("Gawker") is a Delaware

limited liability company with its principal place of business located in New York City, New York.

3.     Upon information and belief, defendant Sam Biddle ("Biddle") is an individual, domiciled in the State of New York.  At all relevant times, Biddle was, and is, a Senior Writer at Gawker.

4.     Upon information and belief, defendant John Cook ("Cook") is an individual, domiciled in the State of New York.  At all relevant times, Cook was, and is, Executive Editor at Gawker.

5.     Upon information and belief, defendant Nicholas Guido Denton ("Denton") is an individual, domiciled in the State of New York.  At all relevant times, Denton was, and is, Founder and CEO of Gawker.

6.     Upon information and belief, Defendants, and each of them, were and are the agents, licensees, employees, partners, joint-venturers, co-conspirators, owners, principals, and employers of the remaining Defendants and each of them are, and at all times mentioned herein were, acting within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture.  Upon further information and belief, the acts and conduct herein alleged of each of the Defendants were known to, authorized by, and/or ratified by the other Defendants, and each of them.

<u>**JURISDICTION & VENUE**</u>

7.     This Court has personal jurisdiction over Defendants because they have minimum contacts with the State of New York, and are domiciliaries of the State of New York.

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)

because there is complete diversity of the parties to this action and the amount in controversy exceeds $75,000.

9.      Venue is proper in this district pursuant to 28 U.S.C. Section 1391(b), in that each of the defendants reside here and a substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS RELEVANT TO ALL CAUSES OF ACTIONS

10.      In or about October of 2013, Terrill pitched two stories to ELLE magazine about the co-founders of the billion-dollar technology company and dating app "Tinder."  In connection with her research for those stories, Terrill interviewed with Tinder's CEO, Sean Rad ("Rad") and Vice President of Marketing, Whitney Wolfe ("Wolfe"), among others.

11.      On or about October 21, 2013, Terrill's interview with Wolfe was posted on Elle.com.

12.      In or about April of 2014, Wolfe resigned from Tinder.

13.      Two months later, on June 30, 2014, Wolfe filed a lawsuit against Tinder, Tinder's parent company Match.com and their parent company, IAC, Inc.  The lawsuit was premised on allegations of sexual harassment and sexual discrimination against Wolfe by Rad, and Tinder's Chief Marketing Officer, Justin Mateen ("Mateen").  The lawsuit made national news, and thousands of articles were written about it.

14.      That same day, Terrill received a phone message from an attorney representing Wolfe.  The attorney informed Terrill of Wolfe's lawsuit against Tinder and offered to send information, or speak to her, about the case.

15.      Terrill read Wolfe's complaint, and certain statements in it seemed inconsistent

4

with Terrill's recollection of the events as described to her by those with first hand knowledge. Terrill then went back to her research, including her recorded interview of Wolfe and others. Terrill found that there were potential inconsistences between Wolfe's allegations in the lawsuit and Terrill's past research, specifically Wolfe's previous statements to Terrill.

16.     In light of the inconsistencies, Terrill shifted the focus of her research, and started researching the founding of Tinder.  Terrill reviewed numerous materials, reached out to more than thirty individuals and conducted on-the-record interviews with at least fourteen sources close to the subjects of this new story.  Terrill sought to fully and fairly research matters which she believed had been only superficially covered by numerous news outlets who had not investigated the underlying facts.

17.     Throughout the course of her research, Terrill sought only to ascertain the truth regarding Tinder's history as well as the allegations in Wolfe's lawsuit.

18.     After leaving Tinder, Wolfe joined two other ex-Tinder employees, Sarah Mick ("Mick") and Christopher Gulczynski ("Gulczynski") to launch a competitor company called "Bumble."  The event was major business news, and covered in thousands of news articles.

19.     On or about August 18, 2015, Terrill received a voicemail message from Bumble's Vice President of Communications, Jennifer Stith ("Stith"), who stated that she wished to "confirm" with Terrill that she was working on a piece about Whitney Wolfe "before taking any next steps."

20.     Hours later, Terrill received a voicemail message from the attorney representing Wolfe in her lawsuit.  Wolfe's attorney demanded that Terrill make contact with him before she wrote anything "that could potentially subject [Terrill] or others to legal liability."  The obvious

implication of the statement was that if Terrill proceeded to research and/or write about the underlying facts regarding Wolfe, including the potential inconsistencies between Wolfe's past statements and other events from the past, and Wolfe's allegations in her lawsuit against her fellow co-founders at Tinder, then Terrill could expect a lawsuit to follow.

21.    Almost immediately following these two phone calls, Terrill's personal computer and smart phone started acting erratically and showing signs of potentially having been hacked. Terrill also observed unusual activity in her personal surroundings.

22.    Terrill reached out to a friend of hers for help with this situation and the friend referred her to a producer at Gawker.  Hoping the producer might have some insight or advice, Terrill explained the two phone calls to the producer and described the unusual activity with both her personal computer and smart phone.  Terrill expressed concern about potentially being hacked and intimidated.  The producer at Gawker told Terrill that Gawker Executive Editor John Cook and his team had the resources to research the unsettling activity that Terrill was experiencing.

23.    Gawker Senior Writer Sam Biddle then contacted Terrill and told Terrill that she could trust him.  Terrill expressed to Biddle that she was looking for help with her situation and unsure of what to do.  She asked Biddle to maintain the confidentiality of the information that she was to share with him, and provide her with whatever advice or assistance that he could. Biddle agreed; assured Terrill that her communications to Gawker would be treated confidentially; agreed that Gawker would not misappropriate her story; asked her to furnish supporting materials; and informed Terrill that he intended to provide her with advice and assistance in her situation.

6

24.     Apparently, all such statements, representations and agreements by Defendants to Terrill were knowingly false at the time they were made.  Terrill was not aware of the falsity of the statements, representations and agreements, and reasonably relied upon the truth of those statements, representations and agreements to her detriment.  Defendants in fact had no interest, desire or intent to assist Terrill.  Nor did Defendants have any interest in seeking the truth underlying the story of the co-founders of Tinder or any discrepancies in Wolfe's allegations in her complaint against her fellow co-founders.

25.     Rather, Defendants had only one interest:  to write their own scathing article about Terrill in a way that was knowingly false, libelous of Terrill, and would foreseeably harm, if not destroy, her personal and professional reputation.

26.     The motivation for Biddle's betrayal, in addition to economic gain, appeared to be Biddle's ongoing personal relationship with Wolfe and Gulczynski, which he actively concealed from Terrill.  In fact, on information and belief, Biddle was regularly communicating with Wolfe and Gulczynski throughout the time that Terrill was confiding in Biddle.  Biddle concealed his relationship with Wolfe and Gulczynski from Terrill because Biddle knew that he could not successfully induce Terrill to disclose her confidential research if she knew about the relationship with Wolfe and Gulczynski.

27.     On or about November 23, 2015, Defendants' published on Gawker's flagship website Gawker.com, a lengthy story with the headline "Tinder Confidential: The Hookup App's Founders Can't Swipe Away the Past" (the "Gawker Story"), a true and correct copy of which is attached hereto as Exhibit A.  The Gawker Story is replete with numerous false statements of fact, of and concerning Terrill, which Defendants knew to be false at the time the Gawker Story

was written and published.

28.   The false statements in the Gawker Story include, among others:

a.   "Ashley Terrill was in hiding the first time I heard her voice, splitting time between her Los Angeles home and a $600-a-night room at the Beverly Wilshire Hotel. Terrill had locked her laptop and phone in a secret vault, and would only contact me on disposable phones—all because, she claimed, the estranged co-founder of Tinder was trying to destroy her."

b.   "At the center is Ashley Terrill, a Hollywood columnist on an obsessive, possibly unhinged pursuit of what she says is the truth about Whitney Wolfe. Depending on who's doing the guessing, Terrill is the target of a secret harassment operation, the agent of a covert mudslinging campaign, or an outside observer caught up in a paranoid freakout."

c.   "It's this audio recording that Terrill says is proof that Whitney Wolfe is not who she says she is—neither a victim nor a co-founder, but a fraud who parlayed a sex lawsuit into a career boost and fame."

d.   "Terrill's claims range from dubious to absurd, but her exhaustive investigation into Wolfe's background has pumped the submerged bile between the two camps up to the surface."

e.   "Terrill's research is an anomaly in the saga of Wolfe vs Tinder, a rare attempt to discredit rather than lionize the plaintiff."

f.   "…Ashley Terrill was compiling evidence against her for some sort of intricate character assassination."

8

g.   "…[Wolfe] should expect a 'takedown story' coming soon from Terrill."

h.   "…[I]t immediately looked like a covert attempt to smear her (and her company) without breaking their mutual non-defamation agreement."

i.   "…Terrill's takedown [story] could appear as a magazine story, a book, or possibly even a film, all aimed at portraying [Wolfe] as the villain in the Tinder breakup."

j.   "Terrill … claimed she'd found vast inconsistencies that not only undermined the legal case, but Wolfe's entire character. It was deeply personal."

k.   "Terrill's conclusion was that Wolfe is [a businesswoman who ruthlessly exploited every opportunity for her gain (even if unethically)]."

l.   "Terrill was in a state of absolute terror and perpetual anxiety—it hung on her voice as she mentioned ... the friends she could no longer contact, and the people she could no longer trust."

m.   "[T]he only evidence she furnished of a phone hack was a generic security warning message."

n.   "The most interesting part was a denial that she'd been put up to her project by her friend at Tinder, nor been compensated for it"

o.   "…[S]he's still making a very charged claim about someone from whom she has little objective distance. Why call Wolfe a liar, a year later?"

29.   The forgoing false statements of fact were made by defendants with the intention and knowledge that they were false and were likely to harm Terrill's personal and professional reputation.  The false and libelous statements in the Gawker Story had the foreseeable effect of

9

severely harming Terrill's personal and professional reputation.

30.     Gawker is a company that routinely engages in wrongful conduct, and specifically, writes and publishes false and defamatory statements about people, invades people's privacy and other rights, and publishes content that is irresponsible and that no other legitimate publication will publish.

31.     Gawker has been sued multiple times for defamation, including currently in an action in New York State Court by the *Daily Mail* newspaper, and in an action in California by an individual named Charles Johnson, for writing and publishing false and unsubstantiated rumors that Mr. Johnson had been involved in misconduct and criminal activity.

32.     Gawker also has been sued repeatedly for invading the privacy of others. Gawker recently lost a case filed by Terry Bollea (professionally known as "Hulk Hogan") for publishing an illegal, secret recording showing him naked and having consensual sexual relations in a private bedroom.  In March 2016, a Florida jury awarded Bollea $115 million in compensatory damages plus $15 million, $10 million and $100,000, respectively, in punitive damages against Gawker, Denton and former Editor in Chief of Gawker.com, A.J. Daulerio.

33.      Gawker also was sued by, and paid a substantial settlement, for publishing a stolen private video of actors Rebecca Gayheart, her husband Eric Dane, and an acquaintance, partially nude in a hot tub.

34.     Gawker has also been sued for copyright infringement, including by Dr. Phil's production company, after Gawker planned to "steal," and did air, portions of an interview before it aired on Dr. Phil's television show.

35.     Gawker published videotape of a clearly intoxicated young woman engaged in

sexual activity on the floor of an Indiana sports bar (the footage was taken by another patron with his cell phone).  According to published reports, Gawker callously refused to remove the footage from its site for some time, despite repeated pleas from the woman to do so and despite the fact that it was not clear that the sex was consensual or whether the video was footage of a rape in progress.

36.     Gawker paid a source for a photograph of what the source claimed was NFL quarterback Brett Favre's penis.  Gawker published the photo, uncensored, stating that it was a photograph of Mr. Favre's penis.

37.     Gawker published photos of Duchess Kate Middleton's bare breasts, captured by a paparazzi's telephone lens while she was sunbathing at a secluded, private estate in France.

38.     Gawker published complete, uncensored, and unedited videos of seven innocent individuals being beheaded by ISIS soldiers.  The videos were distributed by ISIS for the purpose of terrorizing the Western world.  On information and belief, Gawker was the only established media company to publish these videos in full and uncensored, showing the victims being beheaded. Gawker was criticized severely by the press and terrorism experts for furthering the terror campaign of ISIS, and showing a total lack of regard for the families of these victims.

39.     Gawker hacked a promotional campaign sponsored by Coca-Cola, in which the company utilized the hashtag "#MakeItHappy." The campaign was originally designed to allow people to type statements into a decoder, and the decoder converted the statements into positive, happy statements.  Gawker's hack caused the campaign to publish highly offensive statements from Adolf Hitler's *Mein Kapf*.  Gawker was resoundingly criticized throughout the media for its actions.

40.     Gawker attempted to publicly "out" a private individual, a media executive at a rival publishing company, by publishing a story alleging that the executive had attempted to solicit a male porn star and prostitute.  Gawker's actions in publishing these allegations, including identifying the executive by name and the company for whom he worked, publishing the accusations of the gay porn star, and protecting the identity of the porn star "source," were severely criticized throughout the media industry.  As a result, Gawker removed the story within about a day.  A few days later, two senior executives at Gawker promptly resigned their positions, and many other Gawker employees followed suit.  It was reported that multiple major advertisers pulled their advertising from Gawker, and Gawker's revenues sank.  Following these events, several more executives and employees resigned or were terminated.

41.     In the past year, seven of the nine most senior executives at Gawker and Gawker.com resigned:  President of Advertising Andrew Gorenstein, COO Scott Kidder, Chief Strategy Officer Erin Pettigrew, Chief Technology Officer, Tom Plunkett, Editorial Chief Tommy Craggs, SVP of Global Sales and Partnerships, Michael Kuntz, and Editor-in-Chief of Gawker.com, Max Reid.  Of the original Executive Board from one year ago, only CEO/founder Denton and head lawyer Heather Dietrick remain at the company.  (Gawker had no CFO during this time.)

42.     A former Gawker staff writer, Dayna Evans, published a November 2015 article entitled, "On Gawker's Problem With Women," ("the Evans Article") in which the writer exposed gender inequalities within the company as well as an endemic of reporting failures and failures of journalistic ethics.  The Evans Article states that the company's reporting tactics "can lead to dismissiveness and insensitivity, harm and marginalization, often unforgettable and

12

unforgivable damage."  The Evans Article further states that writers and editors at the company "are in fact REWARDED and admired for their recklessness and immaturity, a recklessness and immaturity, that, as you know, has gotten the company in heaps of trouble over the past couple of years."  The Evans Article goes on to state that the above assertions are true, "especially so at a place like Gawker, where bylines are associated with traffic and traffic is associated with success."

43.     In 2010, Gawker and Denton hired Biddle as a writer for Gawker's technology focused website, Gizmodo.com.  Biddle was subsequently promoted to Editor of Valleywag, a sub-site of Gawker.com that focused on Silicon Valley.  At the end of 2014, Gawker and Denton announced that they were closing the Valleywag site and transferred Biddle to Gawker.com.

44.     Biddle's professed goal is to destroy people's reputations and lives on the Internet, under the banner of journalism.  In 2010, before joining Gawker, Biddle wrote: "Is it petty to not share in the happiness of someone else's success? Is it petty to wish—to beg, even, knuckles blistering, eyes bloodshot, beseeching each god—for their horrific downfall."  Biddle reinforced this philosophy in April 2014 when he stated that he would "like to have a 20-to-1 ratio of ruining people's days versus making them" and that he writes the types of articles he does because "I like attention."

45.     In 2013, Biddle shared on Valleywag a tweet sent out by a private media executive that contained a joke made in bad taste.  Biddle's sharing of the tweet caused the executive to be subject to widespread scorn and lose her job.  Biddle later admitted that his sharing of the tweet caused "an incredibly disproportionate personal disaster" for the executive.

46.     Later in 2013, Biddle wrote a post on Valleywag that took the comments of a

Silicon Valley venture capitalist out of context and made implicit accusations of racism.

47.     In March 2014, Biddle sanctioned an article by a junior writer comparing a dating website to WWII Comfort Women.  Following the wide-ranging fall out from the article, Biddle's response was: "It was a joke."

48.     In October 2014, during National Bullying Prevention Month, Biddle tweeted distasteful messages supporting bullies, stating: "Nerds should be constantly shamed and degraded into submission" and that society should "Bring Back Bullying."  The tweets and fall out that ensued caused several companies to withdraw advertising from Gawker.  Gawker executives admitted that Biddle's tweets, and the lost advertisers that followed, cost Gawker at least $1 million in advertising revenue.

49.     On information and belief, during the times described above, and based on Biddle's own public statements about his use and abuse of narcotics, Biddle was consuming substantial amounts of narcotics including benzodiazepines, anti-depressants and SSRIs (selective serotonin reuptake inhibitors).  This abuse was known at Gawker, including by Denton and Cook, and they continued to employ Biddle, reward him, and assign him to write various articles.

50.     Defendants have no interest in reporting the truth to the public, or investigating the facts underlying a story, or for that matter even telling the truth to their readers.  Rather, Defendants make up lies about the subjects of their stories—Terrill being one—without any regard to the substantial consequences that their false statements will have on the subjects of their stories: destroying their personal and professional reputations.

51.     Defendants also have no regard for maintaining the confidentiality of their

sources (here, Terrill), or honoring their assurances, representations, and agreements to their sources to maintain confidentiality and not write stories (particularly false and completely fictionalized stories) about their subjects.  Rather, Gawker's only interest is to publish false scandal, for the purpose of profit, knowing that the false stories will severely harm if not destroy the careers of innocent people who are the subject of their stories.

52.     This is precisely the situation in this case:  Defendants' actions have had the effect of so severely discrediting Terrill—based on Defendants' knowingly false statements about her— that Terrill's career has been severely harmed, if not destroyed.  On information and belief, as a direct result of Defendants' publication of the false and defamatory statements about Terrill, Conde Nast Entertainment decided not to publish or produce Terrill's work and Buzzfeed declined to hire her as a writer at its website.  Terrill is further informed and believes that Defendants interfered with other opportunities of hers, including with *New York Magazine* and Buzzfeed.

53.     According to Gawker.com, more than 157,000 people have read the story that Defendants wrote and published, and presumably those readers have spoken to others about the story.  Moreover, anyone who might search Terrill through a search engine will see Gawker's false and libelous story about her.  As a result, anyone who might otherwise have been inclined to hire or partner with Terrill will likely decline, and have declined, to do so, believing Defendants' false and libelous statements about her to be true.

54.     Defendants actively and knowingly participated in the conduct described herein.

55.     Defendants are guilty of intentional misconduct.  Defendants had actual knowledge of the wrongfulness of the conduct described herein and the high probability that

injury or damage to Plaintiff would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

56.     Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of persons exposed to such conduct.

57.     Defendants' actions described herein also have had the foreseeable effect of causing severe emotional distress to Terrill.

58.     On December 24, 2015, Terrill's counsel sent a letter to Defendants requesting that they remove each of the false statements in the November 23, 2015 story and publish a correction, apology and retraction of those statements.  Defendants failed to comply with Terrill's request, in whole or in part.

59.     As a result, Terrill had no other alternative but to file this lawsuit.

60.     Terrill requests herein all available legal and equitable remedies, to the maximum extent permissible by law, including without limitation compensatory damages and punitive damages in an amount not less than Ten Million Dollars ($10,000,000).

## FIRST CAUSE OF ACTION
### (Libel)

61.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 60 of this First Amended Complaint as if fully set forth herein.

62.     As described herein, on or about November 23, 2015, Defendants authored and published false statements about Plaintiff in a lengthy story on the website Gawker.com entitled "Tinder Confidential: The Hookup App's Founders Can't Swipe Away the Past."  These false statements include:

>   a.   "Ashley Terrill was in hiding the first time I heard her voice, splitting time

16

between her Los Angeles home and a $600-a-night room at the Beverly Wilshire Hotel. Terrill had locked her laptop and phone in a secret vault, and would only contact me on disposable phones—all because, she claimed, the estranged co-founder of Tinder was trying to destroy her."

b.  "At the center is Ashley Terrill, a Hollywood columnist on an obsessive, possibly unhinged pursuit of what she says is the truth about Whitney Wolfe. Depending on who's doing the guessing, Terrill is the target of a secret harassment operation, the agent of a covert mudslinging campaign, or an outside observer caught up in a paranoid freakout."

c.  "It's this audio recording that Terrill says is proof that Whitney Wolfe is not who she says she is—neither a victim nor a co-founder, but a fraud who parlayed a sex lawsuit into a career boost and fame."

d.  "Terrill's claims range from dubious to absurd, but her exhaustive investigation into Wolfe's background has pumped the submerged bile between the two camps up to the surface."

e.  "Terrill's research is an anomaly in the saga of Wolfe vs Tinder, a rare attempt to discredit rather than lionize the plaintiff."

f.  "…Ashley Terrill was compiling evidence against her for some sort of intricate character assassination."

g.  "…[Wolfe] should expect a 'takedown story' coming soon from Terrill."

h.  "…[I]t immediately looked like a covert attempt to smear her (and her company) without breaking their mutual non-defamation agreement."

17

i.   "…Terrill's takedown [story] could appear as a magazine story, a book, or possibly even a film, all aimed at portraying [Wolfe] as the villain in the Tinder breakup."

j.   "Terrill … claimed she'd found vast inconsistencies that not only undermined the legal case, but Wolfe's entire character. It was deeply personal."

k.   "Terrill's conclusion was that Wolfe is [a businesswoman who ruthlessly exploited every opportunity for her gain (even if unethically)]."

l.   "Terrill was in a state of absolute terror and perpetual anxiety—it hung on her voice as she mentioned ... the friends she could no longer contact, and the people she could no longer trust."

m.   "[T]he only evidence she furnished of a phone hack was a generic security warning message."

n.   "The most interesting part was a denial that she'd been put up to her project by her friend at Tinder, nor been compensated for it"

o.   "…[S]he's still making a very charged claim about someone from whom she has little objective distance. Why call Wolfe a liar, a year later?"

63.   These false statements wrongly accuse Plaintiff of having made statements and acted in a manner that would subject her to hatred, distrust, contempt, aversion, ridicule and disgrace in the minds of a substantial number in the community, and were calculated to harm her social and business relationships, and did harm her social and business relationships.

64.   The statements made by Defendants were false and no applicable privilege or authorization protecting the statements can attach to them.

18

65.     Defendants made the above false statements after Biddle: (a) fraudulently represented to Plaintiff that her communications to Gawker would be treated confidentially and that Gawker would not misappropriate her story, and (b) concealed the fact that he was in regular contact with Wolfe and Gulczynski during the time that he was inducing, and did induce, Plaintiff to disclose confidential and highly sensitive information to him.

66.     Plaintiff has been seriously damaged as a direct and proximate cause of the falsity of the statements made by Defendants in an amount to be determined at trial.  The false statements attribute conduct, characteristics and conditions incompatible with the proper exercise of Plaintiff's business and duties as a journalist.  Because the statements were widely disseminated on the Internet, they were also likely and intended to hold the Plaintiff up to ridicule and to damage her social and business relationships.

67.     The above-quoted published statements constitute egregious conduct constituting moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages relating to defendants' making of the above-quoted defamatory statements, in an amount to be determined at trial.

68.     Plaintiff has complied with all notice requirements prior to filing this action by informing Defendants of their defamatory statements, and requesting a retraction, in a letter dated December 24, 2015.

### SECOND CAUSE OF ACTION
**(Breach of Confidence)**

69.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 68 of this First Amended Complaint as if fully set forth herein.

70.     Plaintiff requested, and Biddle agreed, that Plaintiff's communications to

Defendants would be treated confidentially; that Defendants would not misappropriate her story; and that Defendants would provide advice and assistance in her situation.

71.     As a result of the agreement between the parties to maintain the confidentiality of Plaintiff's communications and story, Plaintiff disclosed, and Defendants encouraged Plaintiff to disclose, confidential and proprietary information, including much of the confidential and highly sensitive information Plaintiff obtained through interviews and research.  Terrill made clear to Defendants that she did not provide the information and materials to Defendants for publication or quoting.  To the extent that Defendants wished to convey Terrill's work in a story, Terrill was willing to agree that Defendants may publish her work only as expressed in her emails to three specific news outlets (Texas Tribune, Vice/Broadly, and Buzzfeed), in its full written expression, and not as selected or block quotes (which would be a mischaracterization of her work).

72.     Plaintiff reposed trust and confidence in Defendants and Defendants encouraged and accepted such trust.

73.     Defendants have improperly breached their promise of confidentiality to Plaintiff and have improperly used the confidential information they obtained as a result of such confidential relationship by:

(a)  Repudiating any obligation of confidence to Plaintiff;

(b)  Widely disseminating Plaintiff's confidential research in the Gawker Story published at Gawker.com;

(c)  Using and disclosing to others, in competition with Plaintiff, Plaintiff's confidential information or exploiting such confidential information for Defendants' profit.

20

74.     Defendants have acted knowingly, willfully, and unlawfully, and with the intent to use and profit from Plaintiff's confidences.

75.     Defendants acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

76.     Plaintiff has suffered and will continue to suffer irreparable injury by reason of the aforementioned conduct.

77.     Plaintiff has additionally suffered and will continue to suffer monetary loss as a result of the breach of confidence in which Defendants have engaged.

78.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Intentional Interference with Prospective Economic Advantage)**

79.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 78 of this First Amended Complaint as if fully set forth herein.

80.     Defendants knew that Plaintiff, being a journalist, had business relationships with publishers as well as a reasonable expectation of entering into valid business relationships with additional publishers, including Conde Nast Entertainment, Buzzfeed and *New York Magazine*, which would have been completed had it not been for Defendants' unlawful acts.

81.     Defendants acted solely out of malice, and/or used dishonest, unfair, or improper means to interfere with Plaintiff's actual and prospective business relationships, when Defendants defamed Terrill, disclosed confidential sources and information to the public despite

21

promises to maintain confidentiality, and misappropriated Terrill's story.

82.     Defendants, through the misconduct alleged herein, intended to harm Plaintiff by intentionally and unjustifiably interfering with her actual and prospective business relationships.

83.     Defendants have seriously damaged Plaintiff's actual and prospective business relationships as a direct and proximate cause of these acts.

84.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

85.     Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 84 of this First Amended Complaint as if fully set forth herein.

86.     Defendants intentionally and fraudulently misrepresented to Plaintiff that her communications to Gawker would be treated confidentially and that Gawker would not misappropriate her story.

87.     Defendant Sam Biddle also concealed his ongoing close, personal relationship with Wolfe and Gulczynski, who are among the subjects of Plaintiff's story, from Plaintiff. Biddle was regularly communicating with Wolfe and Gulczynski throughout the time that Plaintiff was confiding in Biddle and providing him with confidential information at his request and inducement, and under an obligation to Terrill to maintain such information in confidence.

88.     Defendants knew that the representations described herein were false at the time they were made.  Defendants, while knowing that Plaintiff had reposed her trust and confidence in them, were under a duty to disclose the truth to Plaintiff.

22

89.     Plaintiff relied on Defendants' misrepresentations to her detriment.  Defendants' misrepresentations and omissions were intended to induce, and did induce, Plaintiff to disclose her confidential and proprietary research.

90.     Plaintiff has been seriously damaged as a direct and proximate result of these misrepresentations by Defendants.

91.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Negligent Hiring and Retention)**

92.      Plaintiff hereby repeats and realleges each and every allegation set forth in paragraphs 1 through 91 of this First Amended Complaint as if fully set forth herein.

93.     At all times relevant to the allegations herein, Biddle was engaged in the abuse of multiple drugs including benzodiazepines, anti-depressants and SSRIs (Selective Serotonin Reuptake Inhibitors), while employed at Gawker and particularly during the time that he engaged in conversations with Plaintiff and subsequently researched and wrote the Gawker Story.

94.     At all relevant times, Gawker, Denton and Cook knew or should have known of Biddle's open and continuing abuse of such drugs, and the impact that it was having on his mental health, and the caustic and reckless articles that Biddle was writing about people as a result.

95.     At all relevant times, Gawker, Denton and Cook also knew or should have known that Biddle sought to libel and destroy the lives of the subjects of his reporting.  In connection with Biddle's reporting, Gawker and its executives, including Denton and Cook, received outcry

and criticism about Biddle while Biddle was employed with them.

96.     Gawker, Denton and Cook failed to take reasonable care in the hiring and/or retention of Biddle.

97.     Gawker, Denton and Cook placed Biddle in a position to cause foreseeable harm to others (including Terrill) by placing and retaining Biddle in the position of Senior Writer.

98.     The above-described conduct is egregious and constitutes moral turpitude.  As such, in addition to compensatory damages and/or presumed damages, Plaintiff demands punitive damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ashley Terrill respectfully requests:

(a) An award of damages to Plaintiff in an amount to be determined at trial, but in all events not less than Ten Million Dollars ($10,000,000);

(b) An award of punitive damages to Plaintiff in an amount to be determined at trial;

(c) An order requiring Defendants to make a public retraction of the false statements;

(d) An order granting preliminary and permanent injunctive relief to prevent defendants from making further defamatory statements about Plaintiff; and

(e)  An award of such other and further relief as the Court may deem just and

proper.


Dated: April 5, 2016                              Respectfully submitted,


                                                  **HARDER MIRELL & ABRAMS LLP**


                                                  By: *_/s/ Charles J. Harder_____*

                                                  Charles J. Harder, Esq.
                                                  132 S. Rodeo Drive, Suite 301
                                                  Beverly Hills, California 90212
                                                  Tel. (424) 203-1600

                                                  Andrea Moss, Esq.
                                                  100 Church Street, 8th Floor
                                                  New York, New York 10007
                                                  Tel. (212) 242-6152

                                                  *Counsel for Plaintiff*


25